**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KEVIN P. BURKE,**

      **Plaintiff,**                          **Civil Action 2:21-cv-48**

**v.**                                      **Magistrate Judge Elizabeth P. Deavers**

**OHIO DEPARTMENT OF
REHABILITATION AND CORRECTION,
et al.,**

      **Defendants.**

**<u>OPINION AND ORDER</u>**

This matter is before the Court for consideration of Plaintiff Kevin P. Burke's First

Motion for Partial Summary Judgment.  (ECF No. 76.)  Through his motion, Plaintiff seeks

summary judgment in his favor against Defendants Emma Collins, Warden of the Pickaway

Correctional Institution ("PCI") ("Warden Collins"), and Annette Chambers-Smith, Director of

the Ohio Department of Rehabilitation and Correction ("ODRC") ("Director Chambers-Smith")

in their individual capacities as to liability.  Plaintiff requests that, upon a judgment of liability in

his favor, this matter be set for a hearing on damages, costs and fees.  Also before the Court is a

Motion for Summary Judgment filed by Defendants ODRC, Director Chambers-Smith, and

Warden Collins (collectively, the "ODRC Defendants") (ECF No. 81).  Through their motion,

the ODRC Defendants seek summary judgment in their favor on the entirety of Plaintiff's

remaining claims.  Both motions have been fully briefed.  (ECF Nos. 83-86.)  Further, as ordered

by the Court, the parties have filed supplemental briefs addressed to the current Social Media

Policy governing ODRC employees.  (ECF Nos. 91, 92.)  Accordingly, the parties' dispositive

motions are ripe for decision.  The motions are before the Undersigned for consideration with the

1

consent of the parties.  (ECF No. 6), 28 U.S.C. § 636(c).  For the following reasons, Defendants'

Motion (ECF No. 81) is **GRANTED** and Plaintiff's Motion (ECF No. 76) is **DENIED.**

## I.

Plaintiff Kevin Burke filed this civil rights action pursuant to 42 U.S.C. § 1983 on

January 7, 2021, naming as Defendants ODRC, Warden Collins, and Director Chambers-Smith.

(ECF No. 1.)  On July 2, 2021, Plaintiff filed an Amended Complaint (ECF No. 13) setting forth

additional claims pursuant to § 1983 as well as a claim under 42 U.S.C.§ 1985 and naming as

additional Defendants ODRC Chief Inspector Christopher Lambert ("Chief Inspector Lambert"),

ODRC Deputy Chief Inspector Roger Wilson ("Deputy Chief Wilson"), Global Tel*Link

Corporation ("GTL"), and John Doe Employees of GTL.  By Opinion and Order dated January

10, 2022, the Court dismissed Plaintiff's claim under 42 U.S.C. § 1985.  (ECF No. 31.)  More

recently, the Court granted Plaintiff's motions to dismiss Counts Four, Five, Six, and Seven.

(ECF Nos. 73, 75.)  Thus, for purposes of the current cross-motions, Plaintiff's remaining claims

are those set forth in Counts One, Two, and Three of the Amended Complaint.  (ECF No. 13.)

These claims, as pled, include the following:

> **Count One: Violation of 42 U.S.C. §1983 by a constitutional violation of the Freedom of Speech Clause of the First Amendment of the United States Constitution made applicable to the States by the Fourteenth Amendment By adopting the SOCIAL MEDIA policy of the Defendant.**
>
> **Count Two: Violation of 42 U.S.C. §1983 by a constitutional violation of First Amendment retaliation made applicable to the States by the Fourteenth Amendment by applying the unlawful SOCIAL MEDIA policy of the Defendant to the Plaintiff.**
>
> **Count Three: Violation of the Due Process Clause of the Fourteenth Amendment.**

(ECF No. 13 at 11-14.)  By way of relief, Plaintiff requests that the Court declare certain

language of ODRC's SOCIAL MEDIA policy unconstitutional; grant injunctive relief in the

form of reinstatement or, alternatively, front pay and all benefits, including pension contributions, for a period of no less than three years; an award of back pay, benefits and damages; compensatory and punitive damages; and attorneys' fees.  (*See* ECF No. 13 at ¶¶ 106-113.)

In moving for partial summary judgment, Plaintiff argues that Warden Collins and Director Chambers-Smith, unlawfully adopted and enforced ODRC's Social Media Policy against him, and retaliated against him in violation of his First Amendment right to free speech. The ODRC Defendants, in moving for summary judgment on Plaintiff's claims in their entirety, contend that ODRC's interests outweigh Plaintiff's First Amendment right to free speech under the circumstances; ODRC's Social Media policy is not unconstitutional as adopted or applied; Plaintiff was not denied due process under the Fourteenth Amendment; and that Defendants Warden Collins and Director Chambers-Smith are entitled to qualified immunity in their individual capacities.  Plaintiff contends that these Defendants are not entitled to qualified immunity.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial " *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495–96 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); see also Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, ... there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

In this case, the parties have filed cross-motions for summary judgment. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir. 1985)). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## III.

The following relevant facts, taken from various filings, are not in dispute.[1]  Plaintiff was

employed by ODRC as a Corrections Officer at PCI.   (Deposition of Kevin P. Burke, ECF No.

78 at 24, "Burke Depo.")   Plaintiff was terminated from his employment effective October 15,

2020, for alleged violations of ODRC's Standards of Employee Conduct (31-SEM-02, effective

September 3, 2019) including, in part, ODRC's Social Media Policy contained within those

Standards. (ECF Nos.79-2 at 1-3; 80-1 at 66-82.)

The alleged violations resulting in Plaintiff's termination resulted from certain posts and

information set forth on his personal Facebook page.  (ECF No. 79-2 at 1-3.)   Plaintiff made the

16 Facebook posts underlying his termination over an approximate three-week period between

May 28, 2020 and June 17, 2020.  (*Id.*)  Plaintiff was at home on leave following shoulder

surgery at the time he made these posts.  (Arbitration Transcript, ECF No. 81-3 at 44

"Arbitration Tr.")

For approximately two years prior to his termination, Plaintiff was a Special Duty

Transportation Officer.  His daily duties included escorting inmates outside the institution to the

hospital or doctor's appointments.  (Burke Depo., ECF No. 78, at 26.)  Plaintiff was required to

be armed while transporting inmates outside the institution.  (*Id*. at 30-31.)  Plaintiff also served

as Union Local 6550 President from 2018 to 2020.  (*Id.* at 40.)

The Standards of Employee Conduct applicable to Plaintiff contained a number of

narrative paragraphs setting forth ODRC's expectations of employee behavior.  (ECF No. 13-1.)

The stated purpose of the Standards was "to provide written guidelines and notify all employees

---

[1] The record and Plaintiff's briefing specifically are flooded with additional factual
information.  Because that information has no bearing on the resolution of Plaintiff's claims
under the required analyses, the Court has not included it here.

regarding the written rules of conduct that specify prohibited behavior and penalties." (*Id*.) The

Standards "applie[d] to all persons employed by the … (ODRC)." (*Id*.) The Standards advised

that "[a]ll persons employed by …. (ODRC) [were] expected to conduct themselves in a

professional, law-abiding manner." (*Id.*) The Social Media Policy set forth therein specified:

> SOCIAL MEDIA[2]
>
> Use of social media is not permitted on state computers or while on state time unless special permission is granted. Having a personal social media account is permissible; however, it is not permissible to represent yourself on your social media page as a representative of the Department. This includes a prohibition from posting pictures of yourself in the Department uniform, from using the Department logo or any other items that would suggest to the casual observer that you represent the Department. Employees are prohibited from sharing confidential and/or proprietary information on-line and are prohibited from posting or displaying comments or pictures about fellow employees or the Department that are vulgar, obscene, threatening, intimidating, harassing, or a violation of the Department's policies against discrimination, harassment or hostility on account of age, race, religion, sex, ethnicity, nationality, disability, or other protected class, status or characteristic.

(*Id*.)

The Standards also included a Schedule of Rule Violations and Penalties setting forth a

standardized list of offenses and associated penalties, not intended to be all-inclusive. (*Id.*)

Plaintiff was terminated for violating two of the identified Rules in the Schedule – Rule 13 and

Rule 39. Rule 13 prohibited "[i]mproper conduct or acts of discrimination or harassment on the

basis of race, color, sex, age, religion, national origin, disability, sexual orientation, gender

identity or military status." (*Id*.) Rule 39 prohibited "[a]ny act that would bring discredit to the

employer." (*Id*.)

---

[2] At Plaintiff's arbitration hearing, Deputy Chief Wilson testified that on September 1, 2021, the ODRC adopted a new Social Media Policy, 31-SEM-12. (ECF No. 79-7 at 90.) Wilson testified that he believed that the new policy was developed as a result of an increase in social media cases. (*Id*. at 91.)

Plaintiff's Facebook activity came to ODRC's attention by way of an email dated June

15, 2020, and sent by an individual identified only as "John Doh,

<concernedcitizen8808@gmail.com>." Warden Collins, Director Chambers-Smith and two

other ODRC employees received the email. (ECF No. 76-5 at 1.) The email contained the

subject line "Racist officer at PCI," and stated in its entirety:

> I want to bring it to your attention that one of your Corrections officers and acting
> Union President of the PCI chapter is posting inflammatory comments on social
> media regarding todays political climate. Is this really who you want to represent
> staff, supervisors and union members at PCI? This type of blatant ignorance and
> racism has no place inside a prison fence, and most especially, no place acting as
> the leader of a Union chapter. Is it not his job to be fair and unbiased to better
> represent his constituents? And if this is how he feels about civilians, what does it
> say about his attitude toward inmates of color or even officers of color? Will he
> not help a black officer who is in trouble the same as he would help a white officer?
> How can he effectively represent staff in that union, staff who come from very
> diverse backgrounds, fairly and without prejudice? Something needs done. He
> represents the state of Ohio and ODRC in whole, yet is allowed to post this kind of
> hateful rhetoric with ZERO repercussions. This will also be given to 10tv, ABC6,
> NBC4, Fox28, and other media outlets. I will also be posting this on twitter,
> Facebook, and Instagram. This is absolutely unacceptable and I hope this matter is
> taken seriously by anyone who is involved.

(*Id*.)

ODRC quickly undertook an investigation in response to this email. As an initial step,

Chief Inspector Lambert retained third-party digital investigations firm GTL to gather

"intelligence" on Plaintiff and "any other affiliated ODRC employees publicly posting racially or

politically charged materials on social media." (ECF No. 80-2 at 1.) GTL produced a report of

its investigation that included the following "Findings":

> PCI Corrections Officer Kevin Burke publicly posted substantial amounts of racial
> and politically charged content on his personal Facebook profile. In several posts,
> Burke appeared to incite violence against rioters involved with the George Floyd
> and/or Black Lives Matter movement. On June 13, London Correctional Institution
> Corrections Officer Michael Estep commented on one of Burke's posts, referring
> to rioters as "trash of the earth." On June 13, PCI Maintenance Repair Worker
> Brandon McLaughlin commented on a post stating, "Set up death matches for food
> and let them turn on each other and kill one another." On June 10, Burke posted,

"Antifa has taken over Seattle. Please try that in my neighborhood. You will be killed for fun." On June 6, PCI Corrections Officer Jacob Thornsberry commented on a post regarding a war memorial being destroyed. He stated that those responsible "should he shot on sight." On May 29, Burke posted, "So called protestors destroying property deserve a bullet to the head." On June 2, Burke posted, "Just so you know, if you decide to riot in my neighborhood – sticks and stones may break windows but hollowpoints expand on impact." PCI Corrections Officer Jason Thornsberry commented on Burke's post, which he jokingly stated, "So does silverback rounds. Lol!!"

(*Id*.)

 Chief Inspector Lambert tasked Deputy Chief Wilson with investigating Plaintiff. (Deposition of Roger Wilson, ECF No. 79 at 13, "Wilson Depo.")  In the early stages of the administrative investigation, Plaintiff remained on leave.  Deputy Chief Wilson attempted to schedule an interview with Plaintiff for July 8, 2020, but Plaintiff was unavailable.  (ECF No. 76-2 at 61.)  As a result, the decision was made to wait to interview Plaintiff upon his return to work.  (*Id*.)  On August 10, 2020, Plaintiff returned to work and Deputy Chief Wilson interviewed Plaintiff for purposes of the administrative investigation.  (*Id*. at 44-46.)  Warden Collins placed Plaintiff on administrative leave that same day.  (ECF No. 76-2 at 63.)

As part of his investigation, Deputy Chief Wilson also contacted John Doh via email. (ECF No. 84-2.)  He received the following response:

Mr. Wilson,

It would have to be under the condition of anonymity as I feel I have already taken a risk even coming forward with this information regarding Officer Burke. But I also feel it is more important that he accepts responsibility for his words and the damage to those around him at PCI those words have caused.

(*Id*.)  Deputy Chief Wilson responded to John Doh "guaranteeing" confidentiality but received no further response.  (*Id*.)  John Doh's identity has never been established although it was Warden Collins' belief that John Doh was a PCI employee.  (Affidavit of Emma Collins, ECF No. 81-1 at ‖ 5 "Collins Affidavit.")

Deputy Chief Wilson prepared a formal Investigative Report dated August 17, 2020, and addressed to Director Chambers-Smith.  (ECF No. 79-1.)  He defined the scope of his administrative investigation as follows:

> This investigation focused on the Facebook referenced in the Complaint from John Doh and attributed to Corrections Officer Kevin Burke, and comments to those posts attributed to Jacob Thornsberry, Jason Thornsberry and Brandon McLaughlin all of whom are employed at Pickaway Correctional Institution (PCI).  The examination was to determine if these posts and comments were consistent with Personal and Social Media conduct requirements of the Standards of Employee Conduct Policy and the impact of public perception on ODRC, its staff and the ability to supervise inmates in a manner that is non-discriminatory.  The actions of each employee will be addressed in separate reports.

(*Id.* at 3.)  Deputy Chief Wilson reached the following conclusion:

> There is evidence to substantiate the allegation that Officer Kevin Burke has a Facebook account that he used to submit a number of posts and/or comments that are not consistent with Personal and Social Media conduct requirements of the Standards of Employee Conduct Policy, create and perpetuate a negative public perception on ODRC, its staff and the ability to supervise inmates in a manner that is non-discriminatory.  This conduct is contrary to the Personal and Social Media conduct requirements of the Standards of Employee Conduct Policy for ODRC.

 (ECF No. 79-1 at 19.)  He recommended that "further action to include discipline" be considered.  (*Id.*)

 A pre-disciplinary conference was then scheduled for Plaintiff.  The conference was held on September 15, 2020, before a hearing officer.  (ECF No. 76-2 at 7.)  The hearing officer found just cause to conclude that Plaintiff violated Rules 13 and 39 of the Standards of Employee Conduct.  (*Id*. at 10.)  Plaintiff submitted a hand-written statement of rebuttal characterizing John Doh as "part of the cancel culture ravaging this nation today," expressing his opposition "to the anarchy, rioting, murders, arson and socilists (sic) activity in attempt to ruin America," and noting that it "appear[ed] [he] had offended this group" but that "their actions have offended [him] as well." (ECF No. 76-2 at 15-17.)  Plaintiff's statement concluded with "I did not know

that my constitutional rights were taken away from me by working for the State of Ohio." (*Id.*)

Ultimately, Warden Collins removed Plaintiff from employment with ODRC. (Collins Affidavit, ECF No. 81-1, at ¶ 4.) The decision was hers alone. Warden Collins based her decision on "[t]he extensive nature of Mr. Burke's Facebook posts, which [she] found to be racist and violent." (*Id.; see also* Arbitration Tr. at 158-159 "I felt that there were a lot of extreme violence in this post and a lot of those were racist.")

A Notice of Removal dated October 6, 2020, and signed by Warden Collins and Director Smith was issued to Plaintiff. (ECF No. 79-2 at 1-3.) The first page of the Notice of Removal states:

This letter is to advise you that you are being issued a <u>Removal</u>

from the position of <u>Corrections Officer</u>                effective <u>October 15, 2020</u>.

for the following infractions:       ☐ Absenteeism       ☒ Performance

| Rule 13 | Improper conduct or acts of discrimination or harassment on the basis of race, color, sex, age, religion, national origin, disability, sexual orientation, gender identity or military status. |
|---|---|
| Rule 39 | Any act that would bring discredit to the employer. |

(*Id.* at 3.) The Notice then summarized Plaintiff's relevant Facebook activity as follows:

On June 17, 2020 you shared a post on Facebook which included a photo of apparent George Floyd protesters. You commented on the post "Again arm yourself to shoot the worthless fucks in society in the face. Only violence will put a stop to this bullshit".

On June 12, 2020 you shared a post on Facebook which included a photo by Media Right with the tag line "Miami PD shows Seattle how it's done…Lays the smackdown on rioters…wow". This post was depicting police in an apparent violent engagement with George Floyd protesters. You commented on the post "love it".,

On June 7, 2020 you shared a post on Facebook with a photo of Colin Kapernick with an inscription "Here is a black man that was raised by white people after his black family abandoned him. Gave him a life he would of never had. Then he turned around and blamed all his problems on white people and cops". You commented on the post "fuck you".

On June 12, 2020 you shared a post on Facebook created by Dixie Rose that depicts a photo of the confederate flag with words above it stating "Never Apologize For Being White".

On June 12, 2020 you posted a photo on Facebook that says "Boycott the NFL" and states "The NFL is no longer a sport...it's a stage for a bunch of thugs and racists to insult our flag, our nation & our vets!"

On June 10, 2020 you shared a post on Facebook of a photo by the Gatewaypundit.com. The photo depicts an apparent aerial view of Seattle with the text "Antifa Releases List of Demands After Taking Over 6 Square Block Section in Seattle and Setting Up Armed Security Watch..." You commented on the post "Antifa has taken over Seattle. Please try that in my neighborhood. You will be killed for fun".

On June 8, 2020 you shared a post on Facebook that depicts a police station with a heading noting bad things will happen when police departments are defunded. You commented "Do it. Defund law enforcement. The animals will kill, rape, steal and burn your leftists cities to the ground. Country folk are prepared for this bullshit and will stack the bodies without remorse. When it's over with America will be great again".

On June 5, 2020 you shared a post on Facebook. It is a photo of a man next to a pickup truck with the caption "I hear these riots are coming to the country, is there a bag limit and do we have to tag them?"

On June 2, 2020 you shared a post on Facebook from a television news station depicting a police officer on the ground with the caption Las Vegas officer shot in the head outside casino is on life support, sheriff says". You commented "it's time to put rioters in the grave".

On June 3, 2020 shared a post on Facebook depicting a statement that said "If you decide to riot in my neighborhood, just remember-sticks and stones may break windows but hollow points expand on impact (with a smiley face emoji)".

On June 1, 2020 you shared a post on Facebook depicting a group of people dressed in black with unidentified flags and a caption stating, "Rural America, we are coming". You commented "antifa does not have the stones to visit rural America. We will put worthless asses in the grave".

On May 30, 2020 you shared a post on Facebook depicting a statement that said "If anyone attacks a police officer, corrections officer or first responder the application of immediate death penalty should apply"

On May 30, 2020 You shared a post on Facebook that depicts a photo of protesters with a notation that it is in Houston, Texas and has hashtags Black Lives Matter and George Floyd. You Commented "kill yourselves animals. When you get out of the city we will do it for you".

On May 30, 2020 you shared a post on Facebook depicting a statement that said "When the looting starts the shooting starts". You commented "America needs to put the animals down. Period".

On May 29, 2020 you shared a post on Facebook depicting a statement that said "So called protesters destroying property deserve a bullet to the head".

On May 28, 2020 you shared a post on Facebook that depicts an apparent altercation in a grocery store posted by Antifa Public Watch North. You commented on the photo "Animals need put down" and "This bullshit is not a protest. It's an excuse for animals to loot and set fire. Too bad citizens aren't picking them off from the rooftops".

> You identified yourself on Facebook as works at State of Ohio, OCSEA Chapter 6550 President Pickaway Correctional Institution.

The Notice concluded with the following statement:

> These actions are a violation of the Standards of Employee Conduct section on Social Media, and Standards of Employee Conduct Rules:
>
> #13- Improper conduct or acts of discrimination or harassment on the basis of race, color, sex, age, religion, national origin, disability, sexual orientation, gender identity or military status.
> #39- Any act that would bring discredit to the employer.

(*Id*. at 1-3.)[3]

Plaintiff filed this action on January 7, 2021. (ECF No. 1.) Plaintiff also grieved his removal through his union. Following a hearing on October 26, 2021, an arbitrator denied Plaintiff's grievance, finding there was just cause for removal. (ECF No. 81-4.)

With respect to the other individuals investigated in connection with Plaintiff's activity, Brandon McLaughlin and Jacob Thornsberry each received a written reprimand and Jason Thornsberry received no discipline. (Collins Affidavit, ECF No. 81-1, at ¶ 7.) These employees were not transportation officers and Warden Collins "determined that their activity was much less extensive and consisted of primarily agreeing with a few of Mr. Burke's posts." (*Id*.) Further, she determined that these employees "took responsibility for their actions and appreciated the impact their on-line activity could have on PCI." (*Id*. at ¶ 8.) In contrast, Warden Collins viewed Plaintiff as "never remorseful," and noted that "he made clear that he saw nothing wrong with what he had posted and had no concern with the impact of his conduct on PCI, the inmates or his fellow staff." (*Id*.)

---

[3] Screen shots of several of Plaintiff's Facebook posts and his Facebook profile are included in Wilson's investigative report. (ECF No. 76-2 at 29-42.) The Court has reviewed this information in its entirety but for brevity has not included the actual screen shots here.

13

With these facts in mind, the Court will turn to the merits of Plaintiff's three remaining claims. First, however, the Court must address the issue of the ODRC as a named Defendant.

## IV.

Plaintiff brings his claims under 42 U.S.C. § 1983 and has named ODRC as a Defendant, raising Eleventh Amendment immunity concerns. The parties do not appear to have addressed this issue. Nevertheless, "it is well established that courts may consider Eleventh Amendment sovereign immunity *sua sponte. Doe v. State of Tennessee*, No. 3:18-CV-00471, 2022 WL 3365062, at *8 (M.D. Tenn. Aug. 15, 2022), *report and recommendation adopted sub nom. Doe v. Tennessee*, No. 3:18-CV-00471, 2023 WL 2699970 (M.D. Tenn. Mar. 29, 2023) (*citing S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008)). Accordingly, the Court will do so here.

The ODRC is an agency of the State of Ohio and is not a "person" for purposes of § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989). Moreover, the State of Ohio and its agencies are immune from suit under the Eleventh Amendment of the United States Constitution unless the State's immunity has been abrogated by Congress or the State of Ohio has consented to be sued. Neither exception is applicable here. This immunity extends to prohibit federal courts from granting money judgments or injunctive relief against the State and its agencies. *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89 (1984); *Lawson v. Shelby Cnty.*, 211 F.3d 331, 335 (6th Cir. 2000). Accordingly, the ODRC is immune from suit under § 1983 and Plaintiff's claims against ODRC are dismissed. Similarly, "[t]he Sixth Circuit has also held … that in declaratory and injunctive relief actions, the *Ex parte Young* exception only applies to individual officers in their official capacities." *Friends of Georges, Inc. v. Mulroy*, No. 223CV02163TLPTMP, 2023 WL 3790583, at *8 (W.D. Tenn. June 2, 2023) (citing

14

*Kanuszewski v. Michigan Dep't of Health*, 927 F.3d 396, 417 (6th Cir. 2019). Thus, to the extent Plaintiff seeks declaratory or injunctive relief against Warden Collins and Director Chambers-Smith in their individual capacities, such claims are subject to dismissal.

**V.**

**A.     First Amendment Retaliation Claim (Count Two)**

Because it seemingly is the most straight forward of the claims as raised by Plaintiff, the Court begins its analysis with Plaintiff's First Amendment retaliation claim. To succeed on such a claim, Plaintiff must demonstrate "facts that support the following: (1) he 'engaged in protected conduct,' (2) 'an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct,' and (3) 'there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [his] protected conduct.'" *Heyward v. Cooper*, 88 F.4th 648, 657 (6th Cir. 2023) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

Several applicable principles guide the Court in its analysis of "protected conduct" within this framework. First "almost all speech is protected[,] other than 'in a few limited areas.'" *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 760 (6th Cir. 2022) (citing *Novak v. City of Parma*, 932 F.3d 421, 427 (6th Cir. 2019) (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)). In short, "[t]he First Amendment's freedom of speech is not unlimited." *United States v. Puch*, No. 3:19-cr-130, 2020 WL 905268, at *7 (S.D. Ohio Feb. 25, 2020) (collecting cases). This is particularly true where public employee speech is concerned. That is, "[t]hings get complicated, …, when a public employee speaks—because such speech pits the employee's interests in speaking freely against the employer's interests in running an efficient workplace." *Myers*, at 760. This means that, "citizens who enter government service 'must accept certain

15

limitations on [their] freedoms,' including limitations on the scope of their First Amendment rights." *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006)).

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti,* 547 U.S. at 418. "Thus, while a public employee does not shed their First Amendment rights just because of their government employment, the First Amendment's protection is not as robust as in other contexts." *Romero v. City of Middletown*, No. 1:19-CV-307, 2023 WL 2241143, at *8 (S.D. Ohio Feb. 27, 2023). A public employee's speech receives First Amendment protection only when the employee "speak[s] as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). "In adopting this limitation, the Supreme Court sought to accommodate the inherent tension between affording public employees adequate First Amendment protection, but not constitutionalizing every employee grievance." *Romero*, at *8 (citing *Garcetti,* at 420).

In the public employee context, "[c]ourts engage in a three-step inquiry to determine whether speech by a public employee is constitutionally protected." *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019). Importantly, "courts have treated the application of speech restrictions to corrections officers much like they treat the application of such restrictions to law enforcement officers." *Booth v. Fink*, No. 22-CV-10166, 2022 WL 17404884, at *9 (E.D. Mich. Dec. 2, 2022), *aff'd sub nom. Booth v. Washington*, No. 22-2082, 2023 WL 5973001 (6th Cir. Sept. 14, 2023). The First Amendment protects such speech only if it addresses a matter of public (rather than private) concern. *Connick v. Myers*, 461 U.S. 138, 146–47 (1983). Further, the amendment protects the speech only if an employee speaks as a private citizen rather than

pursuant to the employee's job duties. *Garcetti,* 547 U.S. 410, 421–22. Finally, if the speech survives these two steps, the First Amendment protects the speech only if the employee's interest in speaking outweighs the employer's interest in operating—a test that has come to be called "*Pickering* balancing." *DeCrane v. Eckart,* 12 F.4th 586, 594 (6th Cir. 2021) (citing *Pickering*, 391 U.S. 563, 568). Whether a public employee's speech is constitutionally protected is a question of law. *Myers*, 41 F.4th 746, 760 (citing *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463 (6th Cir. 2017)); *see also Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *3 (6th Cir. Jan. 25, 2023) ("the balancing test articulated in *Pickering* … is a matter of law for the Court to decide") (citing *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017)).

To determine whether speech involves a matter of public concern, courts consider "the content, form, and context of [the] statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. "While motive for the speech is a relevant factor, ... 'the pertinent question is not why the employee spoke, but what he said.'" *Myers*, 41 F.4th 746, 760 (quoting *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (quoting *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004)). That means courts "examine 'the point of the speech in question[.]'" *Id.* (quoting *Mayhew*, 856 F.3d at 467 (quoting *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015)). Courts "next ask whether that point concerned the public." *Id.* "Broadly stated, 'speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Id*. (quoting *Westmoreland*, 662 F.3d at 719 (quoting *Connick*, 461 U.S. at 146)). In other words, "speech concerns such matters 'when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Id.* (quoting *Lane v. Franks,* 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "[W]hether speech is shocking or inappropriate is

17

irrelevant to whether it concerns a public matter. *Marquardt v. Carlton*, 971 F.3d 546, 549 (6th Cir. 2020) (citing *Rankin v. McPherson*, 483 U.S. 378, 387 (1987)).

Defendants concede that "some" of Plaintiff's posts/comments at issue here touch on "matters of public concern related to protests over police killings or riots."[4] (ECF No. 81 at 13.) Further, Defendants agree that Plaintiff's speech was made as a private citizen. (*Id*. "There should be no dispute here that Plaintiff's speech was made as a private citizen, versus within scope of his duties as a Correction Officer.") Accordingly, the Court will confine its discussion here to the *Pickering* analysis.

The *Pickering* analysis requires the Court to balance Plaintiff's interest against ODRC's interest as an employer. Assessing ODRC's interest requires the Court to consider whether Plaintiff's speech (1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental impact on close working relationships for which confidence and personal loyalty are necessary, (3) impedes the performance of Plaintiff's duties or interferes with regular operations of the enterprise, or (4) undermines ODRC's mission. *Marquardt,* 2023 WL 395027, at *3. Together, these factors center on ODRC's effective functioning as a public agency. *Id*.

First, however, the Court of Appeals for the Sixth Circuit has instructed that before applying *Pickering*'s balancing test, courts determine "the degree of protection the speech warrants, *i.e.*, the level of importance the speech has in the community." *Bennett v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 977 F.3d 530, 538 (6th Cir. 2020), *cert. denied*, 141 S.Ct. 2795 (2021). As the Sixth Circuit explained:

> Central to the concept of protecting the speech of government employees is the idea that public employees are the most likely to be informed of the operations of public employers and that the operation of such entities is "of substantial concern to the

---

[4] Defendants identify the post of the Confederate flag as one example of a post they contend does not address a matter of public concern. (ECF No. 81 at 19.)

18

public." *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007) (quoting *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004)); *see also Garcetti*, 547 U.S. at 419. "Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law*." Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) (*per curiam*). Here, even if we consider Bennett's speech to include her comment on the election, we must consider the public's interest—or lack thereof—in receiving the information she shared. Compare Bennett's comment on the election—of which she had no special insight—to the litany of cases protecting speakers that are exposing inner workings of government organizations to the public. *See, e.g. Banks*, 330 F.3d at 897 (finding that a board of education engaging in illegal hiring practices is a "concern to the community"); *City of Elyria*, 502 F.3d at 492 (holding that operations of public employers "are of substantial concern to the public," and thus, a public employee's right to comment on such matters are protected). *Id*. at 539 (footnote omitted).

*Id*.

Here, through his posts, Plaintiff was not exposing any inner workings of the ODRC or PCI which are of substantial concern to the public. Because his speech involves a lower level of protection, the balancing test requires less of a showing of disruption by Defendants. The Court now considers each *Pickering* factor in turn.

With respect to the first factor, whether Plaintiff's speech impaired discipline by superiors or caused disharmony, Warden Collins testified at Plaintiff's arbitration hearing that Plaintiff's posts, which she considered to be "both violent and racist" could impact his fellow employees, causing them to "have a hard time working with him." (Arbitration Tr., ECF No. 81-3 at 159.) As she stated, "it would be hard in this environment to rely on him to be there if they really need something based on those posts, if they felt the racist animosity" that she felt upon reading them. (*Id*.) Further, Warden Collins noted that Plaintiff had mentioned two staff members by name in Deputy Chief Wilson's report, and she believed that those staff members would have a hard time working with Plaintiff. (*Id*. at 160.) More broadly, Warden Collins believed staff members would be offended by Plaintiff's comments and "there would be a disruption." (*Id*. at 162.) In her Affidavit, Warden Collins further explained that "teamwork

19

and *esprit de corps* [are] absolutely essential to maintaining order in the prison" and she knew Plaintiff's Facebook posts would "negatively impact the working environment." (Collins Affidavit, ECF No. 81-1 at ¶ 5.) Moreover, consider the possibility of inaction on Warden Collins' part in the face of Plaintiff's speech. Any such inaction "could have been seen as an endorsement of the speech and impaired *future* discipline of similar derogatory statements." *Bennett,* 977 F. 3d 530, 540 (emphasis in original). Indeed, it could have been seen as endorsement of the ideas behind the speech itself and impaired much more than future discipline. *Id*. This factor weighs in favor of Defendants.

As for the second factor, whether the speech detrimentally impacted "close working relationships for which personal loyalty and confidence are necessary," Warden Collins stated that "[i]t was inconceivable to [her] that [she] could retain Mr. Burke after he loudly and repeatedly expressed support for the unlawful use of deadly force." (Collins Affidavit, ECF No. 81-1 at ¶ 5.) She testified that, as a result of the posts, "it would be fair for [her] to believe that [Plaintiff] couldn't perform his duties in a fair and impartial way. And any actions that [Plaintiff] would take would always be questionable when there's a complaint about him." (Arbitration Tr., ECF No. 81-3 at 163.) Plaintiff's role as a transport officer took him "outside the fence" of PCI and required him to be armed while traveling in vehicles with an inmate, a colleague or, in some circumstances, medical squad personnel. (Burke Depo., ECF No. 78 at 30, 36.) Undoubtedly, such a role, involving interactions with inmates in transport vehicles and with individuals outside the confines of PCI, required Warden Collins' trust and confidence in Plaintiff. The divisive nature of Plaintiff's Facebook posts and, in particular those expressing support for the ideas of violence, including summary execution, reasonably could undermine

such necessary trust and confidence.  Accordingly, this factor weighs heavily in Defendants'
favor.

The third factor considers whether Plaintiff's speech interfered with his performance of
his duties or with ODRC's's regular operation.  Warden Collins testified at the arbitration
hearing that she believed Plaintiff would "become a target for the inmate population and a threat
to the safety and security of the institution and others."  (Arbitration Tr., ECF No. 81-3 at 162.)
In her Affidavit, Warden Collins further explained that "it was inevitable that inmates would
learn about [Plaintiff's] Facebook posts one way or another because in the prison setting there
simply are no secrets."  (Collins Affidavit, ECF No. 81-1 at ⁋ 5.)   According to Warden Collins,
information regarding Plaintiff's posts would be useful to inmates either for purposes of
"garnering favor from [Plaintiff]" or to accuse Plaintiff of "misconduct based upon race."  (*Id*.)
Thus, this third factor also weighs in Defendants' favor.

The fourth factor considers whether the speech detracted from ODRC's mission.  The
Standards of Employee Conduct setting forth the Social Media Policy and Rules under which
Plaintiff was charged describe ODRC as "responsible for the confinement and supervision of
offenders until their release from custody in order to perpetuate social order and ensure public
safety."  (ECF No. 79-2 at 69.)   Further, in his report, Deputy Chief Wilson expressed concern
that Plaintiff's posts would "create and perpetuate a negative public perception on ODRC, its
staff and the ability to supervise inmates in a manner that is non-discriminatory."  (ECF No. 79-1
at 18.)  There can be no debate that Plaintiff's posts endorsing violence and advocating summary
execution are contrary to the mission of the ODRC, an agency charged with the care of criminal
offenders in its custody. *See, e.g., Garrison v. Balderrama*, No. 21-1147-SHM-TMP, 2022 WL
17824429, at *2 (W.D. Tenn. Dec. 20, 2022) ("[T]he core functions of prison administration

[are] maintaining safety and internal security.") (quoting *Turner v. Safley*, 482 U.S. 78, 92 (1987)); *see also Blanken v. Ohio Dep't of Rehab. & Correction*, 944 F. Supp. 1359, 1367 (S.D. Ohio 1996) (discussing that "[p]rison safety and security are penological concerns of the highest order[,]" in the context of considering a regulation directed to a prison employee.) Moreover, as Deputy Chief Wilson's concerns indicate, ODRC serves a diverse group of people and posts perceived as racist undermine the mission to supervise inmates in a non-discriminatory manner. ODRC's mission also extends outside the confines of its facilities, minimally to the families and friends of the inmates themselves, and to the public at large. Importantly, the public's potential perception, at minimum of ODRC's ability to supervise inmates in a manner that is non-discriminatory or, more significantly, to protect them from harm cannot be discounted in considering the impact of Plaintiff's posts on ODRC's mission. Accordingly, the fourth factor weighs heavily in Defendants' favor.

In light of the above, and giving all due deference to Defendants in the context of the correctional setting here, the weight of the *Pickering* factors supports Warden Collins' conclusions about the potential impact of Plaintiff's posts. In the face of this, Plaintiff seizes on the predictive nature of these conclusions. (ECF No. 84 at 21-24). This is to no avail. It is well-established that "a public employer does not have to show actual disruption to prevail under *Pickering*." *Marquardt,* 2023 WL 395027, at *5 (citing *Gillis*, 845 F.3d at 687).[5] Indeed, "it is not necess[ary] for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Gillis,* 845 F.3d at 687. Rather, Warden Collins may "reasonably predict that the employee speech would

---

[5] Thus, there is no need for the Court to address Plaintiff's many arguments directed to this issue point by point.

cause disruption, ... in light of 'the manner, time, and place' the speech was uttered, as well as 'the context in which the dispute arose." *Id.* (quoting *Rankin*, 483 U.S. at 388).

Significantly, as events unfolded in this case, including ODRC's quick action taken in response to John Doh's email, Warden Collins was in a position where she could only make reasonable predictions.  Plaintiff was on leave following shoulder surgery at the time of his Facebook posts.  The record does not indicate that Plaintiff ever returned to work at PCI prior to his termination.  And, further informing Warden Collins' predictions was that Plaintiff's comments, similar to those at issue in *Marquardt*, "were made in the wake of a gripping national media storm" surrounding the killing of George Floyd.  *Id.*, 2023 WL 395027, at *4.  Indeed, the explosiveness of the environment in which Plaintiff made his Facebook posts, and in which Warden Collins was called upon to address them, simply cannot be overstated.

The killing of George Floyd was detailed by the Chief Judge of this Court in *Alsaada v. City of Columbus.*  As Chief Judge Marbley recounted:

> On May 25, 2020, George Floyd, a Black American, presented a counterfeit $20 bill at a convenience store. Police arrived. Moments later, Mr. Floyd showed no signs of life. After Officer Derek Chauvin kneeled on Mr. Floyd's neck for approximately nine minutes and 29 seconds, Mr. Floyd died. "I can't breathe" – a cry for help gasped by an incalculable number of American dying at the hands of government officials, including Mr. Floyd – became an international rallying cry. Days after the killing, protests began across the nation, and Columbus, Ohio was no exception. Most of the demonstrations occurred between May 28 and June 21, 2020, with further protests on either end of the period in response to deaths of other Americans at the hands of law enforcement.

536 F. Supp. 3d 216, 229 (S.D. Ohio 2021); *see also Williams v. The City of Columbus*, No. 2:22-CV-01831, 2024 WL 111674, at *1 (S.D. Ohio Jan. 10, 2024).   Other courts from around the country described the aftermath of the George Floyd killing similarly.  *See, e.g., Tinius v. Choi*, 77 F.4th 691, 695–96 (D.C. Cir. 2023) ("masses of people poured onto the streets to express their outrage against police killings of Mr. Floyd and other Black Americans"); *Index*

*Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 821 (9th Cir. 2020) ("it ignited

protests across the country in support of the Black Lives Matter movement."); *Johnson v. City of*

*San Jose,* No. 21-CV-01849-BLF, 2023 WL 7513670, at *1 (N.D. Cal. Nov. 13, 2023) ("A wave

of public demonstrations followed, during which participants across the country protested Mr.

Floyd's killing and disproportionate police brutality toward Black people."); *Hussey v. City of*

*Cambridge*, No. 21-CV-11868-AK, 2022 WL 6820717, at *6 (D. Mass. Oct. 11, 2022) ("large

protests against police brutality and systematic racism" led "to a racial justice movement not

seen since the civil rights protests of the 1960s."); *Wise v. City of Portland*, 483 F. Supp. 3d 956,

961 (D. Or. 2020) ("George Floyd's tragic killing on May 25, 2020, sparked national and

international protests in support of Black lives and against systemic racism in American

policing."). Adding to the societal tension at the time of George Floyd's death was "a horrifying

and deadly pandemic" "reveal[ing] substantial division in our communities." *Alsaada,* 536 F.

Supp. 3d 216, 229. In short, "2020 was a precedent-setting year" and "remains indelible,

particularly as it proved a tragic flashpoint between the COVID-19 pandemic and deep-seated

racism." *Id*. Stated another way, this was the "already-bubbling disturbance" in which Warden

Collins was required to consider the potential impact of Plaintiff's Facebook posts. *Marquardt,*

2023 WL 395027, at *4.

Taking all of the above into account, the Court finds Warden Collins' "prediction of

future disruption" to be reasonable and will not question it. *Marquardt,* 2023 WL 395027, at *5.

Further supporting the Court's deference to Warden Collins' predictions is the depth of

experience she brought to her decision-making process. At the time Warden Collins became

aware of Plaintiff's Facebook posts, she had been an ODRC employee for approximately 25

years, having started in the role of a corrections officer in 1995, and ascended through the ranks

at various institutions, culminating at that point, in her role as Warden at PCI. (Deposition of Emma Collins., ECF No. 82-1, at 8-9.) Additionally, Warden Collins reached her conclusions following a thorough investigation by ODRC, including an interview with Plaintiff and a pre-disciplinary hearing. For his part, Plaintiff raises many challenges to the reasonableness of Warden Collins' conclusions. None of them, however, are persuasive.

For example, Plaintiff devotes significant discussion to whether some or all of his posts were addressed to matters of public concern. He confusingly ties his argument to Warden Collins' statement indicating that she considered the "overall totality of all [Plaintiff's] posts" and found all of them to have violated the Social Media Policy and Rules 13 and 39. By Plaintiff's count, Defendants identified 9 posts as not being of public concern and argues against such identification. Plaintiff's extreme parsing misses the point. Defendants conceded that several of Plaintiff's Facebook posts touched on matters of public concern. Thus, the Court has proceeded with the *Pickering* analysis. Accordingly, it is of no consequence whether Plaintiff was removed for one post as in *Bennett*, two posts as in *Marquardt*, or all of the sixteen posts at issue here, the analysis is the same. And, having undertaken that analysis, the Court has concluded it favors Defendants.

Plaintiff also cites his job history as evidence that any concern that he would be unable to perform his job is not justified. He describes Warden Collins' alleged concern about his judgment regarding the use of deadly force as "overblown and unrealistic." (ECF No. 84 at 41.) He fails, however, to explain why his work record, exemplary or not, is relevant here. The question Defendants faced was not whether Plaintiff had competently performed his job in the past. Instead, the issue was whether Plaintiff's posts undermined his ability to do his job going forward. It was fair for Defendants to conclude that the perception of his ability to be trusted –

by his superiors, his colleagues, the inmates entrusted to his care, or the public, including, of course, inmate family members – might be significantly undermined regardless of his past job performance. *See, e.g., Schneiter v. Carr,* No. 21-CV-135-JDP, 2022 WL 1773484, at *9 (W.D. Wis. June 1, 2022).

Most notable, however, is Plaintiff's defense of his posts on the basis of his view that "none of [them] contained any racial epithets or slur words referring to any identifiable protected class or specifically named group." (ECF No. 84 at 10, 28.) Most generously, this argument demonstrates a fundamental misunderstanding of speech deemed offensive and the fact that language, like many things, is not static but evolves over time.[6] Additionally, it wholly disregards the idea that a word "may appear innocent or mildly offensive to one who is not a member of the targeted group, but be … intolerably abusive or threatening when understood from the perspective of a [person] who is a member of the targeted group." *Bennett*, 977 F.3d 530, 543.[7]

---

[6] "One of the things that Americans have a whole lot of trouble with – actually, that people in developed societies with written languages have trouble with – is that words never keep their meaning over time. A word is a thing on the move. A word is a process." "The Racially Charged Meaning Behind the Word 'Thug,'" Transcript of Interview with John McWhorter, Associate Professor of English and Comparative Literature at Columbia University, April 30, 2015, npr.org.

[7] The insensitive tenor of this argument was also on display in Plaintiff's counsel's manner of questioning Warden Collins at her deposition. When Warden Collins testified that she considered the words "thug" and "animal" – terms used in certain of Plaintiff's posts - to be racist, Plaintiff's counsel challenged her as to her understanding of the meaning of the term" racial epithet" itself. Rather than accept Warden Collins' perception of the words "thug" and "animal" as racist, counsel proceeded to cite not only the N-word in full as an example but to cite other examples of racial epithets that fairly can only be characterized as dated or generationally limited. (ECF No. 82-1 at 20-26.) Counsel then emphasized portions of that exchange not once, but twice, in his summary judgment response. (ECF No. 84 at 31, 48.) Further, he argued: "The circumstances of Plaintiff's posts are that they contain no overt racism. Warden Collins may have that opinion, keeping in mind to her the words "rat," "thug" and "animal" used in any context by Plaintiff are racial epithets. (*Id*. at 41.) He also gratuitously included that "Warden

26

Plaintiff also seemingly disputes that his posts could be viewed as advocating violence, describing specific posts as "sarcastic," "exaggerated hyperbole," an "invitation to discourse," and "exaggerated hyperbolic musings, conditional and judgmental."  Plaintiff's arguments as stated largely go to the issue of whether his postings fall within the realm of public concern, a matter Defendants already conceded for purposes of the Court's analysis here.   In terms of *Pickering* balancing, however, "the court assesses the employee's speech as the employer reasonably understood it … when making the decision to terminate the employee."  *Schneiter,* 2022 WL 1773484, at *8; *see also Waters v. Churchill*, 511 U.S. 661, 677 (1994) ("courts look to the facts as the employer *reasonably* found them to be").  Many of Plaintiff's comments or shared posts reasonably were viewed by Warden Collins as advocating violence.  For example, Plaintiff commented that "in [his] neighborhood [Antifa would] be killed for fun," and that "[c]ountry folk … will stack the bodies without remorse."   Further, he shared posts stating that "[i]f anyone attacks a police officer, corrections officer or first responder the application of immediate death penalty should apply," and "[s]o called protestors destroying property deserve a bullet to the head."  (ECF No. 79-2 at 1-3.)  Consequently, Plaintiff's views of his speech have no bearing on the Court's *Pickering* analysis.

For these reasons, Plaintiff has not established the first element of his retaliation claim and Defendants' motion for summary judgment is **GRANTED** as to this claim.  *See Marquardt*,

---

Collins had no idea who Angela Davis was and could not 'tell you anything about Angela Davis.'"  (*Id*. at 15.)   Perhaps believing that his Angela Davis reference would bypass the Court as well, he explained that Angela Davis was "the virtually unchallenged leader of vituperative, vitriolic anti-prison and racially inflammatory rhetoric of modern times."  (*Id*.)  And, apparently feeling the need to put a fine point on it, counsel attached to his brief a 25-page Wikipedia article on Angela Davis.  (ECF No. 84-1.)

2023 WL 395027, at *3 (granting summary judgment for defendants where plaintiff failed to establish first element of First Amendment retaliation claim).

## B.    Constitutional Challenge to ODRC Social Media Policy (Count One)

Plaintiff contends that the Social Media Policy is unconstitutional as adopted and/or applied because it is overbroad and void for vagueness.  An understanding of this claim, as asserted here by Plaintiff, requires some background.  According to Plaintiff's characterization, the Social Media Policy is "divided into two sets of substantive provisions regarding prohibited conduct."  Plaintiff distinguishes the two provisions as follows:

> First: "Use of social media is not permitted on state computers or while on state time unless special permission is granted. Having a personal social media account is permissible; however, it is not permissible to represent yourself on your social media page as a representative of the Department. This includes a prohibition from posting pictures of yourself in the Department uniform, from using the Department logo or any other items that would suggest to the casual observer that you represent the Department."

> Second: "**Employees are** prohibited from sharing confidential and/or proprietary information on-line and are **prohibited from posting or displaying comments or pictures about fellow employees or the Department that are vulgar, obscene, threatening, intimidating, harassing, or a violation of the Department's policies against discrimination, harassment or hostility on account of age, race, religion, sex, ethnicity, nationality, disability, or other protected class, status or characteristic.**"

(ECF No. 84 at 43) (emphasis added).   In Plaintiff's words, "[t]he first provision deals exclusively with how an employee can represent their association with the ODRC.[8]  The second relates to what conduct is prohibited[.]" *Id.*

---

[8] In Plaintiff's statement of facts, he states that he "never identified himself in any post or on social media as a Corrections Officer."  (ECF No. 84 at 11.)   Whether or not he identified himself in that way is of no consequence to any issues here given Plaintiff's framing of his claims.

By way of relief, Plaintiff requests that the Court declare unconstitutional only the language of the Social Media Policy highlighted above.  (ECF No. 13 at ⁋ 106.)   As the Court understands it, however, that specific policy provision was not applied to Plaintiff.  That is, according to the Notice of Removal, Plaintiff was terminated for violating ODRC Rules 13 and 39.  The only violation of the Social Media Policy with which Plaintiff was charged was limited to his identification of himself "on Facebook as works at the State of Ohio, OCSEA Chapter 6550 President Pickaway Correctional Institution."  (ECF No.  79-2 at 3.)  Plaintiff strives to parlay his termination for violating Rules 13 and 39--rules he has not challenged on constitutional grounds-–into a claim challenging ODRC's Social Media Policy.  This effort defies the plain language of Plaintiff's Removal Notice and, in short, is to no avail both overall and to any "as applied" claim specifically.  For this and several other reasons, Plaintiff's constitutional challenge to ODRC's Social Media Policy fails.

First, and most simply, Plaintiff is no longer employed by ODRC.   Thus, Plaintiff lacks standing to bring a claim for declaratory relief because he "'is no longer affected by the challenged policy.'"  *Venable v. Metro. Gov't of Nashville*, 430 F. Supp. 3d 350, 361 (M.D. Tenn. 2019) (quoting *Bennett v. Metro. Gov't of Nashville*, 383 F. Supp. 3d 790, 809 (M.D. Tenn. 2019), *rev'd and remanded on other grounds* by *Bennett*, 977 F.3d 530).  Further, clauses like the one Plaintiff challenges here, are often referred to as "criticism policies" and "[c]ourts have repeatedly rejected facial challenges to these kinds of provisions."  *Booth*, 2022 WL 17404884, at *5, *8-9; *see also Boulton*, 795 F.3d 526, 536 (given the "heavy government interest in promoting order within a law enforcement agency, [such] policies are not facially unconstitutional."  Finally, as to any vagueness claim, Plaintiff has failed "'to demonstrate a realistic danger that the [policy] will significantly compromise recognized First Amendment

29

protections of individuals not before the Court.'" *Venable*, 430 F. Supp. 3d 350, 363 (quoting *City Council of Los Angeles v. Vincent*, 466 U.S. 789, 802 (1984). This requires a demonstration "from actual facts that a substantial number of instances exist in which the [policy] cannot be applied constitutionally." *Id*. (quoting *Am. Booksellers Found. for Free Expression v. Strickland*, 601 F.3d 622, 627 (6th Cir. 2010)). Plaintiff has not attempted such an undertaking, instead choosing to rely solely on conclusory allegations. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's claims set forth in Count One of the Amended Complaint.

**C.     Violation of the Due Process Clause of the Fourteenth Amendment**
**(Count Three)**

In substance, this claim appears largely duplicative of Count One and, certainly, the concepts of overbreadth and vagueness encompass due process principles. *Davis v. Colerain Twp.*, 551 F. Supp. 3d 812, 821 (S.D. Ohio 2021), *aff'd as modified sub nom. Davis v. Colerain Twp., OH*, No. 21-3723, 2022 WL 4351074 (6th Cir. Sept. 20, 2022), *and aff'd as modified sub nom. Davis v. Colerain Twp., Ohio*, 51 F.4th 164 (6th Cir. 2022) ("overbreadth rests on principles of substantive due process"; "[v]agueness may take two forms, both of which result in a denial of due process") (citations and internal quotations omitted). Nevertheless, to the extent that Plaintiff appears to intend a stand-alone Fourteenth Amendment claim, the Court will analyze his claim under the framework specific to such a claim.

"The Due Process Clause of the Fourteenth Amendment says that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" *Schulkers v. Kammer*, 955 F.3d 520, 539 (6th Cir. 2020) (quoting U.S. Const. amend. XIV, § 1). This provision contains distinct procedural and substantive components. *Id.* Plaintiff does not specify the nature of his Due Process claim. (*See* ECF No. 13 ¶¶ 72-83). Consistent with the Court's discussion above,

Plaintiff uses language suggesting that his claim is more substantive than procedural. (*See id.* ¶ 76 (alleging that "Defendants Collins and Chambers-Smith are vested with unbridled discretion to apply vague, arbitrary and capricious rules in making determinations that the Plaintiff had violated the SOCIAL MEDIA Policy of the Defendant Ohio Department of Rehabilitation and Correction in his social media posts.")  *Jones v. Byrnes*, 585 F.3d 971, 976 (6th Cir. 2009) ("[T]he Fourteenth Amendment's due process provision has a substantive component that guarantees 'protection of the individual against arbitrary action of government.'") (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  Moreover, as Defendants also note, the record before the Court confirming Plaintiff's pursuit of his grievance claim through arbitration suggests that he is not intending to assert a procedural due process claim.

This discussion of Plaintiff's manner of pleading aside, in his Response to Defendants' summary judgment motion Plaintiff characterizes his Fourteenth Amendment claim not as a substantive due process claim but as an Equal Protection claim.  (*See, e.g.*, ECF No. 84 at 4 "Plaintiff is making an equal protection argument under the 14th Amendment." (*Id*. at 52-54.  "In short, the named comparables were similarly situated and all of the facts regarding the investigation of the named comparables vis a vis the Plaintiff, and the Warden's interpretation of posts demonstrate the Plaintiff was treated substantially different under the same set of operative facts.")   To be fair, there is some suggestion of an equal protection claim buried within Count Three of the Amended Complaint.  For example, Plaintiff asserts:

> 81. The Defendants engaged in disparate and unequal treatment of the Plaintiff when they terminated the Plaintiff based solely upon the content of his lawful speech while permitting other similarly situated employees who made similar public expressions to remain employed.

(ECF No. 13.)  Notably, in the context of their summary judgment motion, Defendants addressed the merits of a purported Equal Protection claim.  Accordingly, the Court will consider the merits of such a claim as well.

"The Equal Protection Clause 'prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'"  *Anders v. Cuevas*, 984 F.3d 1166, 1179 (6th Cir. 2021) (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty*., 430 F.3d 783, 788 (6th Cir. 2005).   In short, the Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike" under the law. *City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432, 439 (1985). "To bring an Equal Protection claim, a plaintiff may allege disparate treatment either based on her membership to a protected class or as a 'class of one.'" *Evans v. Iceman*, No. 2:21-CV-05213, 2022 WL 2954226, at *2 (S.D. Ohio July 26, 2022) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

The gist of Plaintiff's Equal Protection claim, as more well-articulated for purposes of the current motions, is that he was treated differently from three individuals he identifies as comparables:  Reynauld Rey, Brandon McLauglin, and Jacob Thornsberry.  In Plaintiff's view, this different treatment is evident from the fact that, rather than the termination he suffered, these non-management PCI employees received either no discipline or a written reprimand in response to similarly offensive Facebook posts in violation of the Social Media policy.  Plaintiff challenges Warden Collins' articulated bases for her decision.  Defendants contend that, as now clarified, Plaintiff "is asserting a 'class of one' equal protection claim."  (ECF No. 86 at 12.)  The Court agrees.

The class-of-one theory of equal protection was addressed by the Court in Evans:

Under the class-of-one theory, a plaintiff must allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." [*Willowbrook*, 528 U.S. at 564] (citing *Sioux City Bridge Co. v. Dakota Cnty*., 260 U.S. 441 (1923)). However, the Supreme Court has held that the "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598 (2008). The Court explained that the government, as an employer, is allowed to take individualized actions but the government, as a sovereign, is not:

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.

*Id*. at 603.

*Id*. at *2.

As in *Evans*, *Engquist* controls here barring Plaintiff's claim as a public employee. Defendants, in the employer context, maintain discretion to individually assess employees and make individualized employment decisions. Accordingly, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's Fourteenth Amendment claim, clarified by Plaintiff to be an Equal Protection claim, as set forth in Count Three.

## VI.

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 81) is **GRANTED.** Plaintiff's First Motion for Partial Summary Judgment (ECF No. 76) is **DENIED.** The Clerk is **DIRECTED** to enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

**Dated:  February 15, 2024**                    */s/ Elizabeth A. Preston Deavers*
                                                **ELIZABETH A. PRESTON DEAVERS**
                                                **UNITED STATES MAGISTRATE JUDGE**